NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HABERMAN CONSTRUCTION
COMPANY, Respondent.

No. 79–1120.

United States Court of Appeals,
Fifth Circuit.

June 2, 1980.

Rehearing Granted July 15, 1980.

Elliott Moore, Deputy Associate, Gen. Counsel, Charles P. Donnelly, John S. Irving, John E. Higgins, Jr., Robert E. Allen, N.L.R.B., Washington, D. C., for petitioner.

Manitzas, Harris & Padgett, J. Joe Harris, San Antonio, Tex., for respondent.

Louis V. Baldovin, Jr., Director, Region 23, N.L.R.B., Houston, Tex., for other interested party.

Before TUTTLE, GOLDBERG and RANDALL, Circuit Judges.

GOLDBERG, Circuit Judge:

At first blush, it appeared that we confronted a labor question of first impression in the courts of appeals: To what extent is a collective bargaining agreement, whose genesis is a pre-hire agreement, enforceable beyond the projects already under way at the time of its repudiation? However, following substantial consultation of authority, and subsequent to a great deal of reflection, we have concluded that this question simply involves the application of a labor law principle of ancient vintage: a union's majority in a unit, once established, is rebuttably presumed to continue.

The dispute in this case derives from the disruption of the relationship between respondent, Haberman Construction Co., a construction firm operating in Austin, Texas, and the union, Local 1266 of the United Brotherhood of Carpenters and Joiners of America. This relationship had its origin in 1973 when respondent hired Jessie Beshears, a union member, to be its carpenter foreman, and began paying Beshears' benefits into the carpenters' welfare, pension and apprentice training fund (the benefits) in accordance with the contract then in effect between the union and the Austin Chapter of the Associated General Contractors (union-AGC contract). Under Beshears' tutelage, this burgeoning relationship grew to significant proportions since Beshears, according to his own testimony, hired "strictly union carpenters." Some of respondent's growing complement of union carpenters were hired by Beshears on the basis of his personal knowledge of their work; others were procured through his use of the union hiring hall.

Although respondent never formally executed a collective bargaining agreement with the union, and despite the fact that respondent was not a member of the AGC, by May, 1973 respondent was remunerating its carpenters at the pay scale provided by the union-AGC contract. Furthermore, when this contract expired on August 31, 1974, and was replaced by a contract effective from September 1, 1974 through March 31, 1977, respondent instituted the new contract's higher wage scale. Respondent also submitted payments for its carpenters' benefits to the union and allowed the employees to maintain a job steward at the worksite.

This amicable relationship ended abruptly on February 14, 1977. On that date, respondent informed its carpenters that it would cease paying for their union benefits, and that it was going "open shop." In response, the carpenters sought the advice of their union business agent. Acting on his advice, at the end of business on February 16, 1977, five of respondent's carpenters relinquished their positions because of respondent's decision to cease payment of their benefits.

The union's charges of unfair labor practices were tried before an administrative law judge. He found that in February, 1977, respondent operated two Austin projects and that the carpenters employed at these two projects constituted the appropriate bargaining unit. He further found that on the date of the discharges, the union represented at least seven of the eleven rank-and-file carpenters in this unit. Hence, it represented a majority of the employees.

The administrative law judge also concluded that respondent had adopted the union-AGC contract. Since the union enjoyed majority status at the time of the breach of the contract, the administrative law judge

concluded that respondent's unilateral cessation of paying union benefits constituted a refusal to bargain in violation of section 8(a)(1) and (5) of the National Labor Relations Act (the Act); that respondent's announcement that it was going "open shop" was coercion in violation of section 8(a)(1) of the Act; and that respondent's unilateral changes in terms and conditions of employment constituted a constructive discharge of the five employees who quit their employ, and thus amounted to a discriminatory discharge in violation of section 8(a)(1) and (3) of the Act.

After adopting the administrative law judge's findings as to the violations, the National Labor Relations Board (the Board) ordered respondent to reinstitute the terms and conditions of the union-AGC contract, to reinstate and make whole the five discharged employees, and to bargain with the union. This case appears before us on the Board's petition for enforcement of its order. We enforce.

## I. Existence of a Collective Bargaining Agreement

It is well settled that a union and employer's adoption of a labor contract[1] is not dependent on the reduction to writing of their intention to be bound. *See, e. g., Certified Corp. v. Hawaii Teamsters Local 996*, 597 F.2d 1269, 1272 (9th Cir. 1979); *Warrior Constructors, Inc. v. Operating Engineers Local 926*, 383 F.2d 700, 708 (5th Cir. 1967); *Rabouin v. NLRB*, 195 F.2d 906, 910 (2d Cir. 1952). Instead, what is required is conduct manifesting an intention to abide by the terms of an agreement.

1. By use of the words "labor contract" here, we refer to both a collective bargaining agreement and a section 8(f) pre-hire contract. Section 8(f)· of the Act, 29 U.S.C.A. § 158(f) (West 1973), in pertinent part, provides the following:
 It shall not be an unfair labor practice . . . for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees and members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice)

*See, e. g., Warrior Constructors, Inc., supra,* 383 F.2d at 708–09; *NLRB v. George E. Light Boat Storage, Inc.,* 373 F.2d 762, 766 (5th Cir. 1967); *Rabouin, supra,* 195 F.2d at 909–10.

The conclusion that respondent manifested an intent to abide by the union-AGC contract, by enjoying its benefits and abiding by its provisions, *see id.* at 910, is well supported by the findings of the administrative law judge:

[T]he evidence in the instant case of Respondent's adoption of the Union-AGC agreement must be regarded as substantial. Respondent's contributions to the Union's trust funds from May 1973 through February 1977, its use of union members exclusively as far as the record shows, it [*sic*] observations of the Union-AGC holidays, its use of the union for referrals, its payment of the union wage scale, its allowance through Beshears of the appointment of a union job steward, and the undisputed testimony of Beshears, whom I credit, to the effect that on some but not all occasions when he wanted to start work at an earlier hour than called for in the union agreement he will check with business agent Rosentritt, all reflects [*sic*] an intention to adhere to the terms of the Union-AGC agreement.

Since these findings are supported by substantial evidence on the record as a whole, *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we conclude that respondent had adopted the union-AGC contract.[2]

because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement . . . .

2. We need not here decide whether respondent's payment of the wage scale and benefits provided by the union-AGC contract would in itself · indicate respondent's intention to be bound by that agreement. *Cf. Roadway Express, Inc. v. Teamsters Local 249,* 330 F.2d 859, 865 (3d Cir. 1964) (acceptance of wages by employees does not bind labor union on issue of existence of labor contract). Rather, we focus on the fact that respondent both enjoyed the benefits of the contract and abided by its

■ Respondent asserted below that it was free to repudiate the union-AGC contract because its adoption of that agreement did not create a collective bargaining agreement, but created instead a pre-hire contract authorized by section 8(f) of the Act. Even were we to assume that only a pre-hire contract came into existence at the time of the adoption of the union-AGC contract,[3] we must still reject this assertion. In light of the administrative law judge's finding that the union commanded majority support by the time of repudiation, a finding which we uphold, the alleged pre-hire agreement had matured into a valid collective bargaining agreement. As stated by the Supreme Court, "when the union successfully seeks majority support, the pre-hire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *NLRB v. Local 103, International Association of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). As a result, respondent's actions of February 14, 1977, were taken in the face of a valid collective bargaining agreement.

## II. *The Unfair Labor Practices*

### A. *Cessation of Benefit Payments*

■■ It is well settled that an employer violates section 8(a)(1) and (5) of the Act, 29 U.S.C.A. § 158(a)(1), (5) (West 1973),[4] by unilaterally changing the terms and conditions of employment without first granting its employees' exclusive bargaining representative the opportunity to bargain about "mandatory" subjects. *See, e. g., NLRB v.*

*Katz*, 369 U.S. 736, 747–48, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962). It is equally well established that contributions to a health, welfare, and pension fund constitute mandatory subjects of collective bargaining. *See, e. g., NLRB v. SAC Construction Co.*, 603 F.2d 1155, 1156 (5th Cir. 1979); *Winn-Dixie Stores, Inc. v. NLRB*, 567 F.2d 1343, 1349 (5th Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978); *United Brick & Clay Workers v. District 50, UMW*, 439 F.2d 311, 314 (8th Cir. 1971); *Hinson v. NLRB*, 428 F.2d 133, 137 (8th Cir. 1970).

■ Given the existence of these two principles, we have no difficulty in affirming the Board's finding of an unfair labor practice here, for respondent does not dispute that it ceased payments of the benefits without bargaining with the union. Since that action accomplished a unilateral alteration in terms and conditions of employment which are mandatory subjects of bargaining, respondent violated section 8(a)(1) and (5) of the Act.

### B. *"Open Shop" Announcement*

The Board found that respondent's communication of its intention to go "open shop" coerced its employees in violation of section 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1) (West 1973),[5] because "such announcement by Respondent conveyed to employees an intent of Respondent to refuse to abide by the terms of an applicable contract and to discontinue dealing with a union with which it was obligated to deal." In contrast, respondent contends that its statement was simply an announcement of its intention to abide by the Texas

---

provisions. *See Rabouin, supra*, 195 F.2d at 910.

3. If a majority of respondent's carpenters supported the union at the time of the adoption of the union-AGC pact, the resulting contract, at the time of its creation, would have constituted a valid collective bargaining agreement binding on respondent. *See NLRB v. Local 103, International Association of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).

4. It shall be an unfair labor practice for an employer—

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

5. The text of section 8(a)(1) of the Act is reprinted at note 4, *supra*.

"right to work law" which prohibits closed shops. *See* Tex.Stat.Ann. art. 5207a (Vernon 1971).

In essence respondent asks us to reject the Board's inference that its statement conveyed an intention to repudiate its bargaining obligations. Even were we to disagree with the Board's assessment of the character of respondent's statement, we cannot reverse its finding, for it is not the province of this court to substitute its judgment for that of the Board when the Board has drawn a plausible inference from competent evidence. *See, e. g., NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Indeed, we find the Board's inference to be quite plausible. Given the fact that respondent's announcement was made simultaneously with its repudiation of its obligation to pay the carpenters' benefits, its statement is quite easily interpreted as a message to its employees that it would not recognize and bargain with the union. The Board's inference of coercion is supported by substantial evidence on the record as a whole.[6]

## C. *Constructive Discharges*

There are two elements to a constructive discharge violative of section 8(a)(3) of the Act, 29 U.S.C.A. § 158(a)(3) (West 1973).[7] First, the employer's conduct must have created working conditions so intolerable that an employee is forced to resign. Second, the employer must have acted "to encourage or discourage membership in any labor organization" within the meaning of section 8(a)(3) of the Act. *See,*

e. g., *Cartwright Hardware Co. v. NLRB*, 600 F.2d 268, 270 (10th Cir. 1979); *J. P. Stevens & Co. v. NLRB*, 461 F.2d 490, 494 (4th Cir. 1972); *NLRB v. Holly Bra of California, Inc.*, 405 F.2d 870, 872 (9th Cir. 1969); *Montgomery Ward & Co. v. NLRB*, 377 F.2d 452, 459 (6th Cir. 1967); *NLRB v. Tennessee Packers, Inc., Frosty Morn Division*, 339 F.2d 203, 204–05 (6th Cir. 1964). We must therefore determine whether respondent's conduct, the withdrawal of its carpenters' benefits, created intolerable conditions and was accomplished to discourage union membership.

## 1. *Intolerable Conditions*

A long line of Board authority, sanctified by judicial approval, establishes the proposition that an employer creates intolerable working conditions when he unilaterally changes a contractual term that is a mandatory subject of bargaining. *See, e. g., Superior Sprinkler, Inc.*, 227 N.L.R.B. 204 (1976); *Marquis Elevator Co.*, 217 N.L.R.B. 461 (1975); *Lifetime Shingle Co.*, 203 N.L.R.B. 688 (1973); *Barwise Sheet Metal Co.*, 199 N.L.R.B. 372, 372–73 (1972); *Johnson Electric Co.*, 196 N.L.R.B. 637, 643–44 (1972); *Jaycot Sanitary Service of Garden Grove, Inc.*, 161 N.L.R.B. 544, 558–59 (1966), *enforced*, 69 L.R.R.M. 2623 (9th Cir. 1968); *Blue Cab Co.*, 156 N.L.R.B. 489, 491 (1965), *enforced sub nom. Teamsters Local 782 v. NLRB*, 373 F.2d 661 (D.C.Cir.), *cert. denied*, 389 U.S. 837, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967); *Keystone Floors, Inc.*, 130 N.L.R.B. 4, 14–15 (1961), *enforced*, 306 F.2d 560, 563 (3d Cir. 1962).

---

**6.** Respondent contends that its "open shop" announcement is speech protected by section 8(c) of the Act, 29 U.S.C.A. § 158(c) (West 1973), which provides that "[t]he expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." This argument is merely a reformulation of respondent's attack on the Board's finding of coercion because section 8(c) does not protect speech which is in itself coercive. *See generally* R. Gorman, Basic Text on Labor Law Unionization and Collective Bargaining, 148–51

(1976). Since we have accepted the Board's determination that respondent's announcement conveyed its intention to withdraw its recognition of the union—its determination to commit an unfair labor practice—the statement is coercive and not protected by section 8(c).

**7.** Section 8(a)(3) of the Act, 29 U.S.C.A. § 158(a) (West 1973), in pertinent part, provides that "[i]t shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . . ."

We heartily concur in this conclusion. Under section 8(d) of the Act, 29 U.S.C.A. § 158(d) (West 1973),[8] a party to a contract who unilaterally modifies a contractual term that is a mandatory subject of bargaining commits an unfair labor practice. *See Chemical Workers Local 1 v. Pittsburgh Plate Glass Co., Chemical Division,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). The employer's breach of this obligation thus forces an employee to accept continued employment only at the loss of his right secured by the Act. Placing an employee in such a position constitutes an intolerable condition of employment.

It is undisputed that respondent unilaterally ceased payment of the carpenters' benefits and that this contribution was required by the collective bargaining agreement. Since these benefits are mandatory subjects of bargaining, *see* p. 295, *supra,* respondent's unilateral change created intolerable working conditions.

**8.** Section 8(d) of the Act, 29 U.S.C.A. § 158(d) (West 1973), in pertinent part, provides the following:

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

### 2. Conduct to Discourage Union Membership

The font of our analysis of respondent's motivation for its conduct is of course the paradigm for section 8(a)(3) established by the court in *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967):

First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must proved to sustain the charge *if* the employer has come forward with evidence of

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2)–(4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.

legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

*Id.* at 34, 87 S.Ct. at 1798.

■■■■ Our research has revealed that at least two categories of conduct are "inherently destructive of important employee rights." One type of such conduct is that which jeopardizes the position of the union as bargaining agent or diminishes the union's capacity effectively to represent the employees in the bargaining unit. *Inter-Collegiate Press, Graphic Arts Division v. NLRB*, 486 F.2d 837, 845 (8th Cir. 1973), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974); *see Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976). This action "creates visible and continuing obstacles to the future exercise of employee rights." *Inter-Collegiate Press, supra*, 486 F.2d at 845 (footnote omitted); *Loomis Courier Service, Inc. v. NLRB*, 595 F.2d 491, 495 (9th Cir. 1979). Examples of such conduct include the grant of super-seniority to returning strikers, *see NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), the institution of fixed work shifts to non-striking workers, action that insured that the strikers, upon return, would be permanently relegated to less desirable shifts, *see NLRB v. Moore Business Forms, Inc.*, 574 F.2d 835, 840–41 (5th Cir. 1978), and the cessation of payments of insurance premiums for strikers, conduct which assured that the employees would be unable to obtain renewed insurance coverage for ninety days past the date of their reemployment. *See id.* at 841–42.

■■■■ The second type of conduct inherently destructive of important employee rights is that which directly and unambiguously penalizes or deters protected activity. *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1386 (9th Cir. 1976); *Portland Willamette Co., supra*, 534 F.2d at 1334; *see NLRB v. Lantz*, 607 F.2d 290, 299 (9th Cir. 1979); *Indiana & Michigan Electric Co. v. NLRB*, 599 F.2d 227, 232 (7th Cir. 1979). Examples of such action include discharges occurring because of the employees' expressed desire to obtain union assistance in attaining compliance with the collective bargaining agreement, *see Lantz, supra*, 607 F.2d at 299, and a discharge resulting from an employee's lobbying of legislators regarding changes in national policy affecting the employee's job security. *See Kaiser Engineers, supra*, 538 F.2d at 1384–86.

■■■■ We have no difficulty placing respondent's action within both of these categories.[9] As we have discussed, see pp.

---

9. In two prior cases involving an employer's unilateral diminution of wages and benefits, the courts have required proof of antiunion motivation to establish constructive discharges violative of section 8(a)(3). *See J. P. Stevens & Co. v. NLRB*, 461 F.2d 490, 494 (4th Cir. 1972); *NLRB v. Brennan's, Inc.*, 366 F.2d 560, 563–65, *modified*, 368 F.2d 1004 (5th Cir. 1966). However, both cases are distinguishable from the instant action because in neither case was there a collective bargaining agreement in existence at the time of the employer's unilateral acts. Thus, the employer's conduct was not taken in abrogation of an existing collective bargaining agreement. As a result, the conduct did not have quite the devastating effect on employees' rights as that which we here condemn; rather, the conduct in those two cases had only a "comparatively slight" adverse effect on employee rights.

In *Cartwright Hardware Co. v. NLRB*, 600 F.2d 268 (10th Cir. 1979), proof of antiunion motivation was also required. The employer was found to have violated section 8(a)(5) of the Act because, without first bargaining with the union, he instituted a new wage and benefits schedule at the expiration of a collective bargaining agreement. At the same time, the employer announced that he would not abide by the contract's union security provision past the date of contract expiration. Subsequent to these actions, the union employees quit. The court required proof of antiunion motive because it found that the employees resigned not because of the unilateral wage and benefits changes, but due to the employees' belief that "they could not work in an open shop without sacrificing their union memberships." *Id.* at 271. Since "a union shop provision does not survive contract termination," *id.* at 272, the

295–296, supra, respondent's conduct amounted to a repudiation of its bargaining obligation. It would be a complete contradiction to state that such action did not jeopardize the union's position as bargaining agent or diminish its ability effectively to represent the carpenters. Furthermore, no conduct could more efficaciously convey to the employees the futility of engaging in concerted activity, and thereby directly and unambiguously deter the exercise of that right, the guarantee most fundamentally protected by the Act. From the carpenters' standpoint, it would be futile to engage in collective bargaining through a representative if respondent would repudiate any resulting agreement at will. Accordingly, respondent's conduct was inherently destructive of important employee rights, and no proof of antiunion motivation is required.[10]

### III. *The Remedy*

Respondent argues that the Board's remedy in this case, going beyond the two projects in existence at the time of contract repudiation, violates section 8(f) of the Act [11] as interpreted by the Supreme Court in *Local 103, International Association of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), and by prior Board precedent. It argues that the enforceability of the union-AGC contract is dependent upon the demonstration of the union's majority status at each project at which enforcement is sought. Since there is no evidence in this case that the union would control a majority of the carpenters at projects not under way at the time of contract repudiation, respondent's argument continues, the Board's remedy cannot extend to those jobsites. In a related attack on the remedy, respondent argues that the Board has exceeded the make-whole rationale behind the Act's remedial section.[12] Respondent argues that at the expiration of the union-AGC contract on March 31, 1977, a date approximately six weeks past the date of repudiation, it would have been free to cancel the carpenters' benefits, fire all of its employees, and therefore refuse to bargain. Respondent asserts that given this freedom of action, the Board's remedy, reinstating the contract that has long since expired, goes beyond restoring the *status quo* existing at the time of its contract repudiation.

To address these concerns, for purposes of logical clarity, we shall separate our discussion into two divisions. First, we shall determine whether the Board's remedy is appropriate in light of the usual principles applied to like situations and developed without reference to section 8(f). Then, we shall examine the legislative purpose behind

employer's action did not deny the employees a right guaranteed by the Act. Proof of antiunion motivation was therefore properly required since the conduct was not inherently destructive of employee rights. In contrast, in this case, respondent's conduct violated the carpenters' rights under section 8(d) and thus was inherently destructive of the employees' rights.

**10.** Respondent argues that no unfair labor practices should be premised on the resignation of the carpenters since the union-AGC contract contained a grievance procedure. The short answer to this contention is that the existence of a contractual remedy does not deprive the Board of jurisdiction to condemn conduct which constitutes an unfair labor practice. *See Great Dane Trailers, supra*, 388 U.S. at 30 n. 7, 87 S.Ct. at 1796 n. 7.

Respondent also argues that the carpenters should have remained on the job in order to "mitigate" respondent's liability. This argument is completely frivolous since it is totally at war with the constructive discharge doctrine. An employer may not impose intolerable conditions in his workplace and expect his employees to remain and acquiesce.

**11.** Section 8(f) of the Act, 29 U.S.C.A. § 158(f) (West 1973), is reprinted at note 1, *supra*.

**12.** Section 10(c) of the Act, 29 U.S.C.A. § 160(c) (West 1973), in pertinent part, provides the following:

If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person and order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter . . . . . .

the enactment of section 8(f), and the section's interpretation by the Board and the courts, to determine if the existence of section 8(f) alters our initial conclusion.

#### A.

In arguing in support of its conclusion that the union-AGC contract applies only to projects existing at the time of repudiation, respondent points to its project-by-project hiring and operations, and to its potential employee turnover.[13] Our examination of the uniform decisions of the circuits, most emphatically including those of our own, convinces us that the factors stressed by respondent are totally irrelevant.

 The general rule is that a union which has shown that it enjoys majority support is entitled to a rebuttable presumption of continued majority status. *See, e. g., Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *J. Ray McDermott & Co. v. NLRB,* 571 F.2d 850, 858–59 (5th Cir.), *cert. denied,* 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978). Our cases have applied this presumption to bargaining units existing in industrial operations that are almost identical to respondent's business.

*NLRB v. Leatherwood Drilling Co.,* 513 F.2d 270 (5th Cir.), *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), provides an example of an employment situation involving extreme fluidity to which the presumption of majority status was applied. The employers were oil drilling companies operating in the Permian Basin, an area in Western Texas and Eastern New Mexico. "Companies in this area normally take less than twenty days to drill a well, then move the rig to a new site where a substantially new crew may be hired or the old crew rehired, resulting in high employee turnover." *Id.* at 271–72. The court applied the presumption, and held that it was not overcome, despite the fact that "employee turnover had reached 900% . . . and [that the employers] each employed less than four of the original certification voters

out of the present work force of eligible voters numbering as high as seventy-seven . . . .." *Id.* at 273.

*NLRB v. Hondo Drilling Co.,* 525 F.2d 864 (5th Cir.), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78 (1976), presents a factual situation also evidencing salient fluidity in employment:

> The Company is a New Mexico corporation engaged in the business of drilling oil and gas wells in the Permian Basin area which covers approximately 160,000 square miles in West Texas and New Mexico. There are 50 to 60 drilling contractors who operate approximately 300 rigs in the Basin. The Union claims to represent the bargaining units for 13 of these contractors. The Company owns six rigs, the use of which is [*sic*] dependent on the number of drilling contracts the Company has at a given time. When in use the rigs are operated on a 24-hour schedule by three crews working 8-hour shifts. Each crew normally consists of three or four roughnecks and one driller. When the well is completed the rig is moved to a new location or taken out of service until another job is available, and the men are either placed on the out-of-work list or transferred to another drilling site, depending on the availability of work and the desire of the men to transfer. The shortest time any rig drilled at one location was 4 days; the longest, 59 days. As a consequence of these circumstances, there is an unusually high employee turnover.

*Id.* at 865. The court described the degree of flux in the following terms:

> Illustrative of this fluctuation in rig personnel, the Company calls attention to evidence which shows that during the 6-month period prior to November 14, 1973, it employed 415 crew members to fill a maximum of 78 jobs. For the two years following certification in 1972, the Company had an employee turnover of 1500 and 1700 per cent, respectively. The

---

**13.** Given the administrative law judge's finding of substantial employee carryover from project to project, we approach this argument with some degree of skepticism. However, we shall assume the veracity of these factors upon which respondent relies.

percentage of turnover of roughnecks from pay period to pay period during the 6-month period under consideration varied from a low of 17 per cent to a high of 58 per cent, an average of 35 per cent to 36 per cent turnover between pay periods. *Id.* at 868. The court categorically rejected the employer's assertion that this degree of instability "requir[es] an exception to the normal presumption of continued Union representative status." *Id.; accord, NLRB v. A. W. Thompson, Inc.,* 525 F.2d 870 (5th Cir.), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78 (1976).

 These cases point to the basic problem with respondent's argument. Respondent contends that its bargaining obligation pertains to the particular projects at which the union has achieved majority status. In making this assertion, however, respondent misconceives a fundamental principle of the Act that a bargaining obligation applies not to projects but to a proper *bargaining unit. See, e. g., Authorized Air Conditioning Co. v. NLRB,* 606 F.2d 899, 904 (9th Cir. 1979) ("The Board's Order requires the Company to recognize and bargain with the Union as the representative of its employees in the appropriate unit"); *NLRB v. SAC Construction Co.,* 603 F.2d 1155, 1157 (5th Cir. 1979) ("Identification of the appropriate bargaining unit is necessary for determining majority status"); *NLRB v. Fabsteel Co. of Louisiana,* 587 F.2d 689, 693–95 (5th Cir.), *cert. denied,* 442 U.S. 943, 99 S.Ct. 2887, 61 L.Ed.2d 313 (1979) (examination of unit change to determine whether bargaining obligation continues). Thus, the proper inquiry to determine whether respondent's bargaining obligation extends to projects not under way at the time of contract repudiation involves the question whether the carpenters employed at those projects are properly included within the bargaining unit to which Haberman's bargaining obligation has attached.[14] *See id.*

 Furthermore, respondent fails to understand that this bargaining obligation endures, and the union's majority position is presumed to continue, despite tremendous fluctuations in unit size occasioned either by huge employee turnover or by employment at additional projects, and that the existence of these factors will in itself neither defeat the use of the presumption nor rebut it. *See, e. g., NLRB v. Middleboro Fire Apparatus, Inc.,* 590 F.2d 4, 8 (1st Cir. 1978) (90% reduction in unit size); *Fabsteel Co. of Louisiana, supra,* 587 F.2d at 695; *NLRB v. Tahoe Nugget, Inc.,* 584 F.2d 293, 306 (9th Cir. 1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979); *J. Ray McDermott & Co., supra,* 571 F.2d at 859; *Hondo Drilling Co., supra,* 525 F.2d at 868 (1500 to 1700 per cent turnover); *A. W. Thompson, Inc., supra,* 525 F.2d at 871–72; *Leatherwood Drilling Co., supra,* 513 F.2d at 272–74; *NLRB v. Little Rock Downtowner, Inc.,* 414 F.2d 1084, 1090–92 (8th Cir. 1969).

 Moreover, its argument fails to recognize that this survival of the bargaining obligation, through the use of the rebuttable presumption of majority status, is *most particularly* applied to industries, like the construction business, in which employment fluctuation is inherent. *See, e. g., Tahoe Nugget, Inc., supra,* 584 F.2d at 306 n.55; *Hondo Drilling Co., supra,* 525 F.2d at 868–69; *A. W. Thompson, Inc., supra,* 525 F.2d at 871–72; *Leatherwood Drilling Co., supra,* 513 F.2d at 270. Nor does respondent account for the facts that the presumption of majority status is also particularly applied where there is, as here, evidence of employee carryover, *see Middleboro Fire Apparatus, Inc., supra,* 590 F.2d at 8, and that the presumption survives the total relocation of the bargaining unit. *See Lammert Industries v. NLRB,* 578 F.2d 1223, 1225 (7th Cir. 1978).

 In view of this strong authority, particularly that of our own creation, re-

---

**14.** We note that the bargaining unit would most likely properly include all of respondent's rank-and-file carpenters employed in the Austin area. *See generally* King & LaVaute, *Current Trends in Construction Industry Labor Relations—The Double-Breasted Contractor and the Prehire Contract,* 29 Syracuse L.Rev. 901 (1978).

spondent's argument that its bargaining obligation does not extend beyond existing projects must fail. As we have shown, the presumption of majority status attached to the carpenters' unit at the time the union achieved majority status. Respondent's sole argument against the applicability of this presumption is the transitory nature of its business and the potential turnover of its employees. The precedent we have discussed undeniably indicates that this argument fails most particularly in an industry, such as this one, in which turnover is inherent. Since respondent has offered no other evidence to rebut this presumption, under normal labor law principles its bargaining obligation survives both the transfer of the carpenters' unit to new projects and the changes in the unit's employee composition.

We must also reject respondent's argument that because the contract expired six weeks after the time of contract repudiation, the Board exceeded its usual power to construct a make-whole remedy. Respondent argues that at the time of expiration it could have cancelled the carpenters' benefits, refused to bargain with the union, folded its tent and slipped into the night.[15] This argument simply misstates the law. At contract expiration, an employer may not unilaterally alter, without bargaining to impasse, a contractual term that is a mandatory subject of bargaining. This result obtains because such a term "by operation of statute continues even after the contract embodying it has terminated." [16] *See Nolde Brothers, Inc. v. Local*

15. Respondent argues that it could refuse to bargain with the union after contract expiration because it would be free to fire all of its employees. This argument is simply a reformulation of its contention that the union's majority status pertained only to existing projects. As our discussion has indicated, see pp. 300–302, *supra*, the termination of particular carpenters alone is insufficient to defeat the union's presumed continuing majority status. *See, e. g., Leatherwood Drilling Co., supra* (bargaining obligation survives relocation of unit to new sites although new crew is hired). Respondent's firing of its carpenters, therefore, would not extinguish its duty to bargain and maintain the *status quo* with regard to the terms of the contract that are subjects of mandatory bargaining.

We note also that respondent's discharge of its union carpenters might run afoul of section 8(a)(3) of the Act. The record contains evidence that many of these employees had been carried over from project to project. Furthermore, there is no evidence suggesting that these workers were in any way not qualified to perform adequately the tasks to which they were assigned. Indeed, respondent's continued use of these carpenters from project to project, as well as others obtained from the union hiring hall, is an indication that respondent believed these workers to be eminently qualified. Thus, any failure of respondent to hire these union members would almost compel the conclusion that the reason for their rejection rested on their loyal adherence to the union; most certainly, this action by respondent would be met with the hostile suspicion of both the Board and this court in light of section 8(a)(3)'s command against discrimination due to union membership.

16. Contractual terms which are solely a product of the contract itself form an exception to the general rule that, at contract expiration, an employer is not free to deviate from contractual terms which are mandatory subjects of bargaining unless he has first bargained to impasse. Since the existence of these terms presupposes the existence of a contract, once that agreement has expired, an employer may alter these conditions without bargaining with the union. *See, e. g., Nolde Brothers, Inc. v. Local 358, Bakery & Confectionary Workers Union,* 430 U.S. 243, 257, 97 S.Ct. 1067, 1075, 51 L.Ed.2d (1977) (dissenting opinion); *NLRB v. Cone Mills Corp.,* 373 F.2d 595, 598 (4th Cir. 1967); *Industrial Union of Marine and Shipbuilding Workers v. NLRB,* 320 F.2d 615, 619–20 (3d Cir. 1963), *cert. denied,* 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). Illustrations of terms of this type include arbitration provisions, *see Nolde Brothers, Inc., supra,* 430 U.S. at 257, 97 S.Ct. at 1075 (dissenting opinion), and union security provisions, *see, e. g., Sun Oil Co. of Pennsylvania v. NLRB,* 576 F.2d 553, 558 (3d Cir. 1978).

We recognize that some cases contain broad statements to the effect that "an employer is not bound by the terms of a collective bargaining agreement once that agreement has terminated." *See, e. g., id.* Such statements, however, are made solely in reference to contractual terms dependent upon the existence of an agreement. *See, e. g., id.* (union security provisions).

Similarly, some cases contain statements that "an employer is always free after termination of the contract to unilaterally change conditions previously established by the contract." *See, e. g., Cone Mills Corp., supra,* 373 F.2d at 598. Such statements correctly reflect an employer's right to alter a condition of employ-

*358, Bakers & Confectionery Workers Union*, 430 U.S. 243, 257, 97 S.Ct. 1067, 1075, 51 L.Ed.2d 300 (1977) (dissenting opinion); *SAC Construction Co., supra*, 603 F.2d at 1156–57; *Cartwright Hardware Co. v. NLRB*, 600 F.2d 268, 269–70 (10th Cir. 1979); *NLRB v. Cone Mills Corp.*, 373 F.2d 595, 598–99 (4th Cir. 1967); *Industrial Union of Marine and Shipbuilding Workers v. NLRB*, 320 F.2d 615, 619–20 (3d Cir. 1963), *cert. denied*, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). Examples of contractual terms which survive contract expiration include a schedule of wages and fringe benefits, *see Cartwright Hardware Co., supra*, 600 F.2d at 269–70, superseniority rights of a shop steward, *see Cone Mills Corp., supra*, 373 F.2d 598–99, employee seniority rights, *see Industrial Union of Marine & Shipbuilding Workers Union, supra*, 320 F.2d 619–20, and grievance procedures. *See id.* Since the carpenters' benefits are contractual terms that continue by operation of the Act, respondent would not have been free to cancel those benefits, even though the contract expired, without first bargaining to an impasse. Thus, the Board's remedy was a precise method of restoring the *status quo ante.*

### B.

██ Respondent attempts to escape from the impact of this jurisprudence by arguing that section 8(f) renders these cases inapplicable to the construction industry. This argument rests on two interrelated assertions. First, respondent contends that the union cannot enjoy a presumption of majority status because the collective bargaining agreement derived from a pre-hire contract. Second, respondent asserts that section 8(f) and its interpreting precedent establish that a pre-hire contract can mature into a collective bargaining agreement only on a project-by-project basis.

ment, but "[t]he question is *how* and *when* he may do so, i. e., whether he must give reasonable opportunity to bargain before he acts." *Id.*

Respondent's first assertion has already been foreclosed by a decision of this circuit. In *NLRB v. SAC Construction Co.*, 603 F.2d 1155 (5th Cir. 1979), the employer argued "that, because the contract involved here is a pre-hire agreement, there is no presumption of majority status under the doctrine of *Dee Cee Floor Covering*, 97 L.R.R.M. 1072, 1073 (1977)." *Id.* at 1157 n.9. The court responded in the following terms:

This argument ignores the 100 percent support of unit employees for the union as of March 31, 1976. Once majority support is gained, "the pre-hire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *NLRB v. Local Union No. 103*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).

*Id.*

██ The court in *SAC Construction Co.* implicitly also rejected respondent's second assertion, that a collective bargaining agreement matures not with reference to a bargaining unit but instead with regard to discrete projects. In determining whether the presumption of majority status had been successfully rebutted, the court examined the degree of union support *in the bargaining unit* which had been newly established because of the employer's abolition of job classifications on April 1, 1976:

On April 1, 1976, there were thus seven or eight employees *in the appropriate unit*. Only two or three were paying dues to the union. The remaining five were laborers who were affiliated with another union. Therefore, we cannot understand how the Board could conclude that a majority existed on April 1, 1976, and thereafter. Simple mathematics reveals the contrary: a majority of the employees *in the unit* were affiliated with a different union.

Such statements thus indicate that "[r]ights that survive contract termination do not live

*Id.* at 1158 (emphasis supplied).[17] Our examination of the legislative context of section 8(f) and its interpretation by the courts and the Board convinces us of the correctness of this implicit answer given in *SAC Construction Co.*

Prior to 1947, the Board declined to exercise jurisdiction over the construction industry because of the occasional nature of employment and because the industry was already substantially organized. S.Rep.No. 187, 86th Cong., 1st Sess. 27, *reprinted in* [1959] U.S.Code Cong. & Admin.News, pp. 2318, 2344; H.R.Rep.No.741, 86th Cong., 1st Sess. 19, *reprinted in* [1959] U.S.Code Cong. & Admin.News, pp. 2424, 2441. However, with the passage of the Taft-Hartley Act in 1947, it was clear that the Board had to assert jurisdiction over the industry. Fleming, *Title VII: The Taft-Hartley Amendments*, 54 Nw.L.Rev. 666, 702 (1960).

This exercise of jurisdiction, however, created significant problems for both employers and employees. These difficulties arose because of the short duration of employment in the industry. If a union had not yet attained majority status, it was an unfair labor practice for an employer to enter into an agreement with the union. *See generally International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The occasional nature of employment and the employer's need to know his labor situation in advance of project initiation often made it difficult for either the employer or the union to abide by the law prohibiting

contracts with minority unions. An employer needed to ascertain his labor costs before beginning a project so that he would be able to submit a completed bid for the construction job. In addition, he required advance assurance that he would be able to obtain a steady supply of skilled labor upon short notice. S.Rep.No.187, 86th Cong., 1st Sess. 28, *reprinted in* [1959] U.S.Code Cong. & Admin.News pp. 2318, 2344–45; H.R.Rep. No.741, 86th Cong., 1st Sess. 19, *reprinted in* [1959] U.S.Code Cong. & Admin.News, pp. 2424, 2442. The problem for the employees arose because the short duration of employment made it difficult to apply the Board's election procedures. S.Rep.No.187, 86th Cong., 1st Sess. 55–56, *reprinted in* [1959] U.S.Code Cong. & Admin.News, pp. 2318, 2373. Thus, construction workers were often denied their right to select a bargaining agent. *Ruttman Construction Co.*, 191 N.L. R.B. 701, 702 (1971).

Section 8(f) was passed to remedy these problems. It frees the employer and the union to sign an agreement before the union achieves majority status. An employer is thus able to plan his costs in advance and rely on the union hiring hall to secure union labor. In turn, a construction worker is able to rely on the union's services as a "central point within the industry to which he can apply for work." Fleming, *Title VII: The Taft-Hartley Amendments*, 54 Nw.L.Rev. 666, 702–03 (1960). In short, by securing an exemption from the representation provisions of section 9 of the Act, 29 U.S.C.A. § 159 (West 1973),[18] section 8(f) is designed to allow an employer and a union

forever and can be destroyed after affording the opportunity to bargain." *Id.*

17. The examination in *SAC Construction Co.* whether the presumption of majority status had been rebutted was necessary because the employer had abolished prior job classifications. *See SAC Construction Co., supra*, 603 F.2d at 1157–58. Here, respondent has introduced no evidence to rebut the presumption other than its claim of employee turnover. As we have seen, see pp. 300–302, *supra*, employee turnover alone is insufficient to rebut the presumption. Thus, the presumption is not rebutted as in *SAC Construction Co.*

18. Section 9 of the Act, 29 U.S.C.A. § 159 (West 1973), in pertinent part, provides the following:

(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjust-

to establish an initial beneficial relationship before the union commands majority support. *See* Aaron, *The Labor-Management Reporting & Disclosure Act of 1959*, 73 Harv.L.Rev. 1086, 1121–22 (1960).

 Nothing in the language or history of section 8(f), however, indicates that Congress, considering the construction industry, intended to alter the consequences of a union's satisfaction of section 9 of the Act. In other words, there is no indication of an intention to exempt the construction industry from the law concerning bargaining relations bottomed on section 9 of the Act— those based on the union's achievement of

ment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

(b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit; or (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been ·established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation or (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

(c)(1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined· in subsection (a) of this section, or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a) of this section; or

(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a) of this section;

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

(2) In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with section 160(c) of this title.

(3) No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this subchapter in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

(4) Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

(5) In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling.

majority status. Nor does the legislative history of section 8(f) contain any hint that Congress, with reference to the construction industry, intended to alter the entity to which a bargaining obligation attaches—the bargaining unit.

In the face of this complete absence of legislative support for its view that its bargaining relationship pertains to existing projects, rather than a bargaining unit, respondent insists that *Higdon Construction Co., supra*, controls the resolution of this issue. This assertion is simply incorrect.

In *Higdon Construction Co.*, the Supreme Court was confronted with the question whether a pre-hire agreement, executed pursuant to section 8(f) of the Act, was binding. The employer and the union had executed such an agreement. This contract contained no union security clause, and the union never achieved majority status. Relying on the Board's reading of the Act, *see id.*, 98 S.Ct. at 656, 660–61, the Court held that the pre-hire contract was not enforceable until the union attained majority status. The Court based its holding on the fact that section 8(a)(5) of the Act imposes a duty to "bargain with a *majority* representative," *id.*, 98 S.Ct. at 658, and its observation that section 8(f)'s "[p]rivileging unions and employers to execute and observe pre-hire agreements in an effort to accommodate the special circumstances in the construction industry may have greatly convenienced unions and employers, but in no sense can it be portrayed as an expression of the employees' organizational wishes." *Id.*, 98 S.Ct. at 659.

In support of its position, respondent points to the following language in the Court's opinion:

The employer's duty to bargain and honor the contract is contingent on the union attaining majority support at the various construction sites. In *N. L. R. B. v. Irvin*, [*National Labor Board v. Irvin-McKelvy*], 475 F.2d 1265 (CA3 1973), for example, the pre-hire contract was deemed binding on those projects at which the union had secured a majority but not with respect to those projects not yet begun before the union had terminated the contract.

*Id.* 98 S.Ct. at 658. Respondent asserts that this language supports its claim that a pre-hire agreement can mature into a collective bargaining agreement only on a project-by-project basis. This assertion, however, rests on a serious misinterpretation of the quoted passage.

The fallacy of respondent's position is shown by examining the case cited by the Supreme Court, *NLRB v. Irvin*, 475 F.2d 1265 (3d Cir. 1973). Full recitation of the facts of this case is essential to its proper interpretation:

The Employer here falls within § 8(f). It employs a more or less stable work force of approximately eighteen employees. Prior to June, 1964, the employees were not represented for collective bargaining. At that time, in order to obtain work from bituminous coal operators needing construction, the Employer signed a collective bargaining agreement with District 50 [International Union of District 50, Allied and Technical Workers]. This agreement was supplanted, on June 27, 1967, by an industrywide contract between the Coal Mine Construction Contractors Association, Inc. (CMCCA) and District 50, by its terms effective from June 1, 1967 to May 31, 1970.

Both the original June, 1964 contract and the June, 1967 contract contained a union security clause and a dues checkoff clause. The June, 1967 contract contained a "most favored nations" clause to the effect that if District 50 executed any contract with a construction contractor in the coal fields and that contract contained more favorable provisions than the CMCCA-District 50 contract, any employer signatory to the latter could immediately have the benefit of identical provisions. On October 29, 1968, District 50 entered into a contract with Zeni-McKinney-Williams Corporation identical with the CMCCA agreement, except that it was a "project only" agreement rather than one for the term June 1, 1967 to May 31, 1970. Shortly thereafter the general counsel of CMCCA advised Dis-

trict 50 that CMCCA considered the Zeni-McKinney-Williams contract to be more favorable than the fixed-term agreement, and that all members of CMCCA were thereafter bound to District 50 only for the period of time required for the completion of *those construction projects then being worked on*. District 50 has always disputed this construction of the "most favored nations" clause, but the Board found that after it entered into a "project only" agreement with a competitor, District 50's contract with the Employer *was converted to a project agreement*. That finding is not in dispute in this enforcement proceeding.

In late 1968 the Employer joined the Association of Bituminous Contractors (ABC) in order to avail itself of an agreement which on December 10, 1968, ABC had signed with UMW. By this time the Employer's customers were advising that to get their construction business the work would have to be done by UMW labor. The Employer continued to recognize the District 50 contract on three or four existing projects. It concluded that as of April 1, 1969, all projects to which the District 50 contract applied were substantially complete. Beginning on April 1, 1969, therefore, it applied to all its employees the provisions of the ABC–UMW contract. The employees joined the UMW. District 50 filed with the Board a charge that the Employer violated Sections 8(a)(1), (2), (3) and (5) of the Act by withdrawing recognition from it and recognizing the UMW.

*Id.* at 1267–68 (footnote omitted) (emphasis supplied).

The court found that because of the enforcement of a union security provision in the employer's contract with District 50, the union enjoyed majority status on the projects in existence at the time of contract repudiation, April 1, 1969. *See id.* at 1268, 1271. The court also found that these projects constituted a single bargaining unit and that subsequent projects formed a second bargaining unit: the "employer's business has more than one bargaining unit (in this case the unfinished projects and subsequent projects to which the first contract by its terms did not apply)." *Id.* at 1269. The court held that since the union had achieved majority status at the unfinished projects, which constituted the bargaining unit to which the contract with District 50 applied, the contract was enforceable as to those projects. *See id.* at 1271. However, as to the second bargaining unit, consisting of projects started subsequent to repudiation, the District 50 prehire agreement did not apply because the "§ 8(f) contract [was] a project rather than a term agreement." *Id.* at 1270. As a result, in the words of the Supreme Court, "the pre-hire contract was deemed binding on those projects at which the union had secured a majority [the bargaining unit to which the District 50 contract applied] but not with respect to those projects not yet begun before the union had terminated the contract [the bargaining unit to which the District 50 contract did not apply]." *Higdon Construction Co., supra*, 98 S.Ct. at 658.[19]

In stating in *Higdon Construction Co.* that the enforceability of a pre-hire agreement "is contingent on the union's attaining majority support at the *various* construction sites," *id.* (emphasis supplied), the Supreme Court meant that the union must achieve majority status at the "more than one" project composing a bargaining unit. The validity of this interpretation is shown by the Court's other statements of the proper rule. *See id.* 98 S.Ct. at 655 ("Under the Board's view of § 8(f), a prehire agreement does not entitle a minority union to be treated as the majority representative of the employees until and unless it attains majority support *in the relevant unit*."

**19.** At least one commentator has agreed with our conclusion that the pre-hire agreement in *Irvin-McKelvy* was found terminable at the end of existing projects because the agreement had been transformed from a term agreement into a project agreement. *See* King & LaVaute, *Current Trends in Construction Industry Labor Relations—The Double-Breasted Contractor and the Prehire Contract*, 29 Syracuse L.Rev. 901, 934 (1978).

(emphasis supplied)); [20] *id.* 98 S.Ct. at 660 ("It is also undisputed that when the union successfully seeks majority support, the pre-hire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees *in the unit.*" (emphasis supplied)). These two statements indicate that the Court concluded that when a union achieves majority support, the section 8(f) agreement matures with reference to a bargaining unit, which may be composed of one or more projects, and not on a project-by-project basis.[21]

Respondent places its greatest reliance on the Board's decision in *Dee Cee Floor Covering, Inc.*, 232 N.L.R.B. 421 (1977). It argues that the Board's remedy in the instant case is inconsistent with *Dee Cee Floor Covering.* Although there is dictum in *Dee Cee Floor Covering* to support respondent's position, we find that, when viewed in terms of Board precedent, this broad language is an aberration, and that this dictum has, in any event, been repudiated by the Board.

The employer in *Dee Cee Floor Covering* had been awarded a contract to buy and install carpeting at a project located at the Fort Riley military base. Upon hiring personnel to perform this work, the employer informed union members that the work would be conducted on a "nonunion basis only" and that it would not pay for any of the fringe benefits it had agreed to provide in a 1973 contract signed with the union. Finding that this agreement was a pre-hire contract, the Board refused to enforce its terms. The Board stated that

[s]uch prehire agreements do not, however, give rise to a presumption of majority status on behalf of the union. Thus, where a union fails to prove that it has obtained majority status among the employer's employees, an employer may withdraw recognition from that union and/or make unilateral changes in the contractual working conditions without thereby violating Section 8(a)(5) of the Act.

*Id.* at 422 (footnotes omitted).

The Board, however, went beyond this application of the rule that a pre-hire agreement with a minority union is unenforceable. It stated that "the mere fact that the Union might indeed have represented a majority of the employees at Respondent Dee Cee's previous jobsites is of no consequence inasmuch as the Union must demonstrate its majority at each new jobsite in order to invoke the provisions of Section 8(a)(5) of the Act." *Id.* (footnote omitted).

Respondent's reliance on this sweeping language in *Dee Cee Floor Covering* fails, for in *G. M. Masonry Co.*, 245 N.L.R.B. No. 54, 102 L.R.R.M. 1542 (1979), the Board expressly repudiated the dictum at issue here. In *GM Masonry*, the employer and the union had in July, 1976, entered into a pre-hire agreement (the July 1976 contract) which "[r]espondent honored until the following June, during which time a majority of its employees on its various projects were represented by the Union." *Id.*, 245 N.L.R.B. No. 54 at 8. Various disputes, how-

20. The Court adopted the Board's view of the enforceability of a section 8(f) agreement before the union had achieved majority status. *See Higdon Construction Co., supra*, 98 S.Ct. at 656, 660–61.

21. We recognize that the word "various" can mean "distinct" as well as "more than one." However, as we discuss, the Court's restatement of the rule it adopted belies the conclusion that the Court meant "distinct" when it used the term "various." Moreover, given the fact that the Act by its terms applies to bargaining units, *see, e. g.*, 29 U.S.C.A. § 159(a) (West 1973) ("Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit

appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for any purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . ."), and that the existence of a bargaining obligation has always turned on the question of majority status within a bargaining unit, *see* p. 301, *supra*, we find it hardly credible to argue that the Court would have wrought such a sweeping change into the law by the use of the single word "various." Therefore, we construe the word so that its use is consistent with the rest of the Court's opinion.

ever, arose concerning work to be performed at Brea, California. As a result, on April 24, 1977, the union and employer signed a separate agreement to apply just to the Brea project (the April 24 contract). The administrative law judge who tried the case refused to enforce this contract, however, for he concluded that the union had not obtained majority support at the Brea site. *See id.*, 245 N.L.R.B. No. 54 at 12. The administrative law judge rejected the General Counsel's contention that the employer and the union had been "parties to a continuous, unbroken bargaining relationship involving successive application of union contracts to all of Respondent's projects . . . ." *Id.* The judge found "that the General Counsel's characterization of the April 24 contract as merely 'successive' involves a straining of the facts." *Id.*

The administrative law judge, however, went beyond his finding that the April 24 contract, applying just to the Brea project, represented the beginning of a bargaining relationship distinct from that existing at the prior projects. Rejecting the General Counsel's contention "that, on April 24, the Union enjoyed a continuing 'presumption' of 'majority status' deriving from the contractual relationship in the year following the execution of the July 1976 contract, during which a majority of Respondent's employees supported the Union," *id.*, 245 N.L.R.B. No. 54 at 9, the administrative law judge stated that

> [t]he lessons of *Dee Cee, supra,* and *Irvin-McKelvy, supra,* seem plain enough and they cannot be reconciled with the

General Counsel's position herein. Those cases clearly require a project-by-project inquiry into the majority status of the construction labor organization which would invoke rights under Section 8(a)(5) of the Act. Such an inquiry may not be aided by a "continuing presumption" of majority status deriving from the labor organization's majority status on earlier projects, but, rather, requires some affirmative indication that the labor organization enjoyed majority support on the project in existence at the time of the alleged wrongful repudiation.

*Id.*, 245 N.L.R.B. No. 54 at 11 (footnote omitted).

 The Board affirmed the decision of the administrative law judge. In so doing, however, it stated that "[i]n adopting the Administrative Law Judge's Decision, we disavow any inference which may appear therein suggesting that the rationale of *Dee Cee Floor Covering, Inc. and its Alter Ego and/or Successor, Dagin-Akrab Floor Covering, Inc.*, 232 NLRB No. 72 (1977), is applicable to 9(a) bargaining relationships." *Id.*, 245 N.L.R.B. No. 54 at 1 n.1, 102 L.R.R.M. at 1542. The Board thus indicated that a collective bargaining agreement which satisfies section 9 of the Act enjoys a presumption of majority status and is enforceable beyond projects under way at the time of the repudiation, and that this result obtains despite the agreement's section 8(f) origin. The language in *Dee Cee Floor Covering* has therefore met its well-deserved demise.[22]

---

**22.** The process of rejecting the statement in *Dee Cee Floor Covering* upon which respondent relies began with its implicit rejection in the instant case. Only Member Murphy attempted to distinguish *Dee Cee Floor Covering* on the ground that "[t]here was no showing there that the union would have majority status on the next project." 236 N.L.R.B. at 79 n.5.

In *VM Construction Co.*, 241 N.L.R.B. No. 84, 100 L.R.R.M. 1625 (1979), the Board again implicitly rejected the *Dee Cee Floor Covering* dictum. It stated that "the Respondent's reliance on . . . cases involving contractual relationships under Sec. 8(f) of the Act is misplaced. The Board has not held that an employer is free to repudiate an 8(f) agreement

where, as here, a majority of the unit employees supported the union at the time of repudiation." *Id.*, 100 L.R.R.M. at 1626. The Board thus ordered bargaining with regard to the appropriate unit; it did not limit its order to projects existing at the time of repudiation. *See id.*

The Board is allowed to alter its interpretation of the Act, for, as stated by the Supreme Court in *Higdon Construction Co., supra,* "[a]n administrative agency is not disqualified from changing its mind . . . ." *Id.*, 98 S.Ct. at 660–61. Furthermore, "when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the stat-

The Board's repudiation of the dictum in *Dee Cee Floor Covering* was necessary because the sweeping language relied on a citation to *Irvin-McKelvy, supra. See Dee Cee Floor Covering, supra*, 232 N.L.R.B. at 422 n.6. Yet, we have shown that the court in *Irvin* refused to apply the matured prehire agreement to new jobsites not because the union had failed to show majority status at those projects, but because by its terms the collective bargaining agreement simply did not apply to the new projects. *See* p. 307 & note 19, *supra*.[23]

Furthermore, the Board's rejection of the broad language in *Dee Cee Floor Covering* was necessary because the statement stood in sharp conflict with other Board precedent. For example, in *Bricklayers & Masons Local 3*, 162 N.L.R.B. 476 (1966), *enforced*, 405 F.2d 469 (9th Cir. 1968), the Board enforced a collective bargaining agreement whose origin was a pre-hire agreement. The Board found this origin to be irrelevant in light of the subsequent dealings between the parties:

It is apparent from the foregoing that the bargaining between the AGC and the Union presents the situation of a continuing bargaining relationship; a situation quite different from that which Congress had in mind when enacting Section 8(f)(1), to wit, an initial attempt by a union and an employer in the construction industry to commence such a relationship. Thus, the entire legislative history of Section 8(f)(1) is couched in terms of "prehire agreement," a reference which can have no meaning in the situation where, as here, the parties are continuing an existing bargaining relationship under which employees have previously been hired.

*Id.* at 478. As a result of this ongoing relationship, the Board held "that the tests to be applied in determining the fulfillment of the bargaining obligations of the parties herein are those generally used under Section 8(a)(5) and (b)(3) . . . ." *Id.* at 478–79. The Board therefore issued a bargaining order which pertained not to just existing projects, but to the "appropriate unit." *Id.* at 486.[24]

The Board used a similar rationale in *Williams Enterprises, Inc.*, 212 N.L.R.B. 880 (1974), *enforced*, 89 L.R.R.M. 2190 (4th Cir. 1975), to deny significance to the fact that a collective bargaining agreement had begun with a pre-hire agreement. In *Williams Enterprises* the Board refused to apply its principle "that an 8(f) contract carries with it no irrebuttable presumption of representative status, and that therefore, in the absence of specific proof of the Union's majority representation, an employer may validly cancel an 8(f) contract during its term." *Id.* at 885. This rejection in part rested on the Board's conclusion that "the doctrine is applicable only to initial 8(f) agreements, and not to succeeding contracts," *id.*, and the fact that there had been contracts subsequent to the original pre-hire agreement. The Board's refusal to apply the principle also rested on the ground that "the doctrine is not applicable where there is independent proof of a union's majority, as here. Such proof has been found in compliance with a valid union-security clause in the contract." *Id.* Since the contract was thus found to be enforceable, the Board ordered bargaining

---

utes." *Id.* We observe that the administrative policy shift approved by the Supreme Court in *Higdon Construction Co.* was never explicitly declared by the Board. *See id.*

23. Commentary supports our analysis that the dictum in *Dee Cee Floor Covering* rests on a misapplication of *Irvin-McKelvy. See* King & LaVaute, *Current Trends in Construction Industry Labor Relations—The Double-Breasted Contractor and the Prehire Contract*, 29 Syracuse L.Rev. 901, 937–38 (1978).

24. This approach of finding section 8(f) to be irrelevant in the face of a continuing relationship has been used in many Board cases, including *Dallas Building & Construction Trades Council*, 164 N.L.R.B. 938 (1967), *enforced*, 396 F.2d 677 (D.C.Cir.1968), *Williams Enterprises, Inc.*, 212 N.L.R.B. 880 (1974), *enforced*, 89 L.R.R.M. 2190 (4th Cir. 1975), and *Custom Sheet Metal & Service Co.*, 243 N.L.R.B. No. 142, 102 L.R.R.M. 1163 (1979).

with regard to the appropriate unit. *Id.* at 894.[25]

█ These principles utilized by the Board in *Bricklayers & Masons Local 3, supra,* and in *Williams Enterprises, Inc., supra,* are equally applicable here. In this case, there is proof independent of the pre-hire agreement to show that the union has achieved majority status in the relevant unit. Accordingly, as in *Bricklayers & Masons Local 3,* and in *William Enterprises,* "the tests to be applied in determining the fulfillment of the bargaining obligations of the parties herein are those generally used under Section 8(a)(5) and (b)(3) . . . ." *Bricklayers & Masons Local 3, supra,* 162 N.L.R.B. at 478–79. Thus, in consonance with the principles generally applied under section 8(a)(5), the collective bargaining agreement is enforceable with regard to the appropriate unit even if that unit is employed at projects not in existence at the time of contract repudiation.

█ In conclusion, we find nothing in the legislative history of section 8(f), nor in the decisions that have interpreted it, to indicate that the applicability of a collective bargaining agreement, originally derived from a pre-hire agreement, is confined to projects existing at the time of contract repudiation. To the contrary, we find that the references in *Higdon Construction Co.* to the union's attainment of majority support in the relevant unit, *see* pp. 307–308, *supra,* approve our holding that a pre-hire agreement matures with reference to the bargaining unit to which it applies.[26]

### C.

█ To summarize, we have concluded that the union-AGC contract, the section 8(f) pre-hire agreement, was transformed into a collective bargaining agreement when the union achieved majority status in the relevant bargaining unit, which was composed of the carpenters employed at respondent's two Austin projects. In addition, we have found that this collective bargaining agreement is to be treated like any other collective bargaining agreement despite its genesis in a pre-hire contract. Therefore, we have further concluded that the rebuttable presumption of majority status was properly applied in this case despite both the potential change in the unit's employee composition and its eventual relocation to other, future projects. As a result,

---

**25.** The notion that the existence of an enforced union-security provision provides "independent proof" of the union's majority status has been applied in many cases to enforce a collective bargaining agreement, whose genesis is a pre-hire contract, with regard to the appropriate bargaining unit. *See, e. g., Authorized Air Conditioning Co. v. NLRB,* 606 F.2d 899 (9th Cir. 1979); *NLRB v. Irvin,* 475 F.2d 1265 (3d Cir. 1973). We see no reason to limit the enforceability of a collective bargaining agreement to a project-by-project basis where, as here, proof of majority status is obtained by the use of direct evidence, while no such limitation is imposed when majority status is shown by the existence of an enforced union-security provision.

**26.** We note that "the development of . . . presumptions is normally the function of the Board," *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 99 S.Ct. 2598, 2607, 61 L.Ed.2d 251 (1979), that its conclusion concerning the propriety of a presumption is entitled to great deference, *see, e. g., Higdon Construction Co., supra,* 98 S.Ct. at 660–61, and that a presumption preserving the status quo is most useful in assuring industrial stability. *See Tahoe Nug-*

*get, Inc., supra,* 584 F.2d at 303–04 & nn.38 & 40. Thus, our task in examining the Board's use of the presumption of majority status in this construction industry context is to "determine only whether adoption of the presumption strikes a fair balance." *Id.* at 304 (footnote omitted). We agree with the assessment that the prior view expressed in *Dee Cee Floor Covering* "that section 8(f) contracts may be repudiated as to projects not underway when the contract is signed, obviously is disruptive of stable relationships. It also contradicts the traditional acknowledgment of area-wide, as opposed to project, units in the construction industry." King & LaVaute, *Current Trends in Construction Industry Labor Relations—The Double-Breasted Contractor and the Prehire Contract,* 29 Syracuse L.Rev. 901, 940 (1978). Since the presumption of majority status serves the laudable purpose of preserving industrial peace, *see Tahoe Nugget, Inc. supra,* 584 F.2d at 303–04, and because prior cases have approved its use in industries like the construction business, *see* pp. 300–302, *supra,* we sanction its use here.

the Board's remedy, applying to future projects, is proper.[27]

## IV.

We have examined the various trees in the forest; we wish now to glance back over our shoulder to view the entire forest. ▌▌ This case involves more than a task of statutory construction. Rather, it implicates three of the most fundamental principles of the National Labor Relations Act. First and foremost, it is concerned with the right of employees to choose their representative in the workplace, the guarantee most sacrosanct of all. This unit of carpenters has expressed its will to be represented by a union. Is it to be deprived of that choice simply because it finds itself in an industry subject to tremendous flux and flow? Congress has answered this query in the negative, and the Board has dutifully obeyed that mandate. Thus, we enforce.

Second, this case involves the mutuality of industrial obligations codified by the Act. The employer here gained significant benefits from its relationship with the union. It was guaranteed a constant supply of skilled, diligent workers from the use of the union hiring hall. More significantly, the union guaranteed industrial peace at respondent's worksite.

However, the traffic of labor relations does not flow down a one-way street. In return for advantages gained from a bargaining relationship, mutual obligations must be observed. The employer saw fit not to obey these traffic laws voluntarily; the Board therefore must force it to do so. Thus, we enforce.

▌ Third, the case implicates the ultimate goal of the Labor Act—industrial stability. Prior to respondent's repudiation of the collective bargaining agreement, peace reigned at its workplace. Its business thrived in this atmosphere of tranquility; so did the employees, for in this state of mutual beneficence they were afforded an opportunity to participate in uninterrupted

gainful employment. Congress has directed the Board to restore pax industrial to this worksite, and the Board has followed this directive. Thus, we enforce.

ENFORCED.

RANDALL, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I and II of the majority opinion but respectfully dissent with respect to the majority's enforcement in part III of the portion of the Board's remedial order which extends to projects not yet begun at the time of the unfair labor practices.

Issues concerning the enforceability of prehire contracts in the construction industry are some of the most difficult in the field of labor law. As the scholarly opinion of the majority demonstrates, the law bearing upon the question whether a prehire contract is enforceable with respect to future projects in a situation in which majority support for a union has once been established in a bargaining unit is highly problematic, largely due to the tension between competing principles developed by the Board in its prior cases.

In *Higdon Construction Co.*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), the Supreme Court settled a crucial issue concerning the effect of § 8(f) prehire contracts. There, the Court adopted the longstanding position of the Board that a § 8(f) prehire contract is voidable until such time as the union achieves majority support in the appropriate bargaining unit. *Id.* at 341, 98 S.Ct. at 655. The Court made clear, however, that "when the union successfully seeks majority support, the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *Id.* at 350, 98 S.Ct. at 660. Because Haberman Construction Company (the Company) repudiated the Union-AGC contract at a time when a

---

**27.** We emphasize that this presumption may be rebutted by objective and convincing evidence supporting an employer's good faith doubt that the union no longer enjoys majority support. *See, e. g., J. Ray McDermott & Co., supra*, 571 F.2d at 858–59. We warn, however, that when "the Union's possible loss of majority status is

attributable to the respondents' failure to bargain in good faith, . . . the Company may not avoid the duty to bargain by demonstrating a loss of majority status arising from its own contumacious conduct." *NLRB v. Alterman Transport Lines, Inc.*, 587 F.2d 212, 228 (5th Cir. 1979).

majority of the employees in the unit supported the Union, I fully agree with the majority that *Higdon* and the Board's prior opinions compel the conclusion that the Company committed unfair labor practices. My disagreement with the majority concerns the propriety of the Board's remedial order, which compels compliance with the Union-AGC contract and reinstatement of the discriminatees on projects not yet begun at the time of the unfair labor practices.

Citing *Higdon*, the Board held that the Company violated § 8(a)(5), (3) and (1) of the Act by unilaterally changing the terms of employment and announcing that it was going "open shop." The Board agreed with the ALJ's recommendation that the Company be ordered to bargain with the Union and comply with the Union-AGC contract. However, the Board disagreed with the ALJ's recommendation that, since the projects on which the discriminatees had been working were in all likelihood completed by the time of his decision, the discriminatees should be made whole only for losses incurred until the end of those projects. Rather, the Board ordered that the employees be reinstated to employment on projects not yet begun at the time of the unfair labor practices, and that they be made whole for all losses incurred because of the discrimination against them since the time of the unfair labor practices. The Board's rationale for its reinstatement and make-whole order was set out in four sentences:

We are aware that, even absent the unfair labor practices, Respondent, which hired employees on a project-by-project basis, might have discharged the discriminatees in the normal course of business when the projects were completed. However, there is a distinct possibility that, absent its discrimination, Respondent would have retained, transferred, or re-hired at least some of the discriminatees for new projects. Accordingly, to remedy fully Respondent's unfair labor practices and protect the discriminatees' rights, we shall order Respondent to reinstate the discriminatees to their former or substantially equivalent positions and to make them whole for any losses they suffered as a result of the discrimination against them . . . . The determination of which employees, if any, would have continued in Respondent's employment and for how long can best be made at the compliance stage of the proceedings, to which we defer the matter.

236 N.L.R.B. No. 7 at 2–3 (footnotes omitted). Thus, the Board ordered reinstatement and contract compliance extending to projects not yet begun at the time of the unfair labor practices without as much as a single citation to its own past decisions or those of the courts.[1]

The problem with the remedial aspect of the Board's opinion concerns its apparent conflict with a principle articulated in past Board decisions—that a union must reestablish its majority status at each new jobsite before it can enforce a § 8(f) agreement. Less than eight months before its decision in this case, the Board, in *Dee Cee Floor Covering*, 232 N.L.R.B. 421 (1977), made its position on the presumption of continuing majority status arising from a § 8(f) contract clear. After recognizing the principle later validated in *Higdon* that "where a union fails to prove that it has obtained majority status among the employer's employees, an employer may withdraw recognition from that union and/or make unilateral changes in the contractual working conditions without thereby violating Section 8(a)(5) of the Act," *id.* at 422 (footnote omitted), the Board went on to conclude that the attainment of majority status on previous jobsites does not give rise to a presumption of *continuing* majority status "inasmuch as the Union must demonstrate its majority at each new jobsite in order to invoke the provisions of Section 8(a)(5) of the Act," *id.* (footnote omitted). Because the union in *Dee Cee Floor Covering* was not entitled to a presumption of continuing majority status, the employer had no em-

---

1. The Board's extremely brief and unenlightening explanation for its remedial order is typical of its general approach with respect to the issue of continuing majority status in the § 8(f) context. *See, e. g., G. M. Masonry Co.*, 245 N.L.R.B. No. 54 (1979); *V. M. Construction Co.*, 241 N.L.R.B. No. 84 (1979); *Roberts & Schaefer Co.*, 193 N.L.R.B. 860 (1971).

ployees at its new jobsite when it abrogated its previous prehire agreement with the union, and, thus, the majority status of the union could not be shown, the Board held that the employer had not violated § 8(a)(5) of the Act.

The notion articulated in *Dee Cee Floor Covering*, that a union must reestablish its majority status at each new jobsite before it can enforce a § 8(f) agreement, has appeared in the Board's decisions for years. *See, e. g., Local Union No. 103 (Higdon Contracting Co.)*, 216 N.L.R.B. 45, 46 (1975); *Roberts & Schaefer*, 193 N.L.R.B. 860, 860 n.3 (1971); *Ruttmann Construction Co.*, 191 N.L.R.B. 701, 702 (1971).[2] However, tension clearly exists between the principle of *Dee Cee Floor Covering* and the language in *Higdon* and prior Board precedent that once majority status is achieved in a bargaining unit "the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." 434 U.S. at 350, 98 S.Ct. at 660.

The conflict between the principle of *Dee Cee Floor Covering* and the principle that when a union achieves majority support in a unit the § 8(f) contract attains the status of a regular collective bargaining agreement is critical in this case because of the nature of the Board's remedial authority. Section 10(c) of the Act, 29 U.S.C. § 160(c), requires the Board upon finding that an unfair labor practice has been committed "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." The remedial power of the Board is "a broad discretionary one, subject to limited judicial review." *Fibreboard Corp. v.*

*NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). *See also NLRB v. J. H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 262–63, 90 S.Ct. 417, 419–20, 24 L.Ed.2d 405 (1969); *NLRB v. Pilot Freight Carriers, Inc.*, 604 F.2d 375, 377 (5th Cir. 1979). The Board's duty under § 10(c) is to make "the employees whole and thus restor[e] the economic status quo that would have obtained but for the company's wrongful [acts]." *NLRB v. Rutter-Rex*, 396 U.S. at 263, 90 S.Ct. at 420. *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976); *NLRB v. Hyde*, 339 F.2d 568, 572 (9th Cir. 1964). While the Board's mandate is to "take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice," *Carpenters v. NLRB*, 365 U.S. 651, 657, 81 S.Ct. 875, 879, 6 L.Ed.2d 1 (1961) (Harlan, J., concurring), the Board's remedial orders must be appropriate and adapted to the situation which calls for redress, *NLRB v. United Mine Workers*, 355 U.S. 453, 458, 78 S.Ct. 386, 389, 2 L.Ed.2d 401 (1958), and they are unenforceable to the extent that they become punitive rather than remedial, *see Carpenters v. NLRB*, 365 U.S. 651, 654–55, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961); *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11–12, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 236, 59 S.Ct. 206, 219, 83 L.Ed. 126 (1938); *NLRB v. Florida Medical Center, Inc.*, 576 F.2d 666, 673 (5th Cir. 1978). Thus, the courts have refused to enforce remedies which seek to ameliorate conditions which would have existed in any event and are, therefore, not dependent upon the existence of an unfair labor practice. *See, e. g., NLRB v. Solboro Knitting*

---

**2.** The Supreme Court's statement in *Higdon* that "[t]he employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites," 434 U.S. at 345, 98 S.Ct. at 658, in conjunction with its citation to *NLRB v. Irvin*, 475 F.2d 1265 (3d Cir. 1973), lends considerable support to the argument that the Board's past position has been that maturation of prehire agreements occurs only on a project-by-project basis. Though the Court's statement can at least partially be explained away by other language employed by the Court in

*Higdon* and by recognizing the limited project-only nature of the prehire contract in *Irvin*, the Court's statement is highly significant, if only to illustrate the confusion which has heretofore obtained with respect to the issue of continuing majority support extending to new projects. It is telling that commentators have construed the Court's statement as an adoption of the principle expressed in *Dee Cee Floor Covering*. *See* King & LaVaute, *Current Trends in Construction Industry Labor Relations—The Double-Breasted Contractor and the Prehire Contract*, 29 Syracuse L.Rev. 901, 934–40 (1978).

*Mills, Inc.*, 572 F.2d 936, 945–46 (2nd Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); *Trico Products Corp. v. NLRB*, 489 F.2d 347, 353 (2nd Cir. 1973); *NLRB v. Charley Toppino & Sons, Inc.*, 358 F.2d 94, 96 (5th Cir. 1966); *Nabors v. NLRB*, 323 F.2d 686, 690 (5th Cir. 1963), *cert. denied*, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964).

The key issue with respect to the aspect of the Board's remedial order which extends to projects not yet begun at the time of the unfair labor practices is whether the Board exceeded its authority to recreate the status quo ante. Under the cases which delineate the scope of the Board's authority, it appears that if the § 8(f) contract would have been unenforceable with respect to projects not yet begun at the time of the unfair labor practices, the Board, by ordering contract compliance and reinstatement, would have exceeded its authority.[3] Thus, the question whether a § 8(f) contract which has become enforceable by virtue of majority support for the union in the appropriate bargaining unit is entitled to a presumption of majority support with respect to further projects is crucial.

In apparent recognition of the interplay between the limitation placed upon the Board's remedial authority and the Board's prior decisions concerning the propriety of a presumption of continuing majority status for future projects, two Members of the Board dissented in part from the Board's remedial order in this case. Footnote five of the Board's opinion sets out Member Penello's position:

> Member Penello would limit the remedy herein to the duration of the projects under way at the time Respondent repudiated its agreement with the Union. To do otherwise would, in his view, go beyond the intent of Sec. 8(f) of the Act. Because an 8(f) agreement does not create a presumption of majority status, a union, to enforce the contract, must show that it represents a majority of employees. [*Higdon Construction Co.*] Where, as here, an employer hires on a project-by-project basis, majority status can be shown for only those projects then under way. [*Dee Cee Floor Covering*]. Thus, Member Penello does not view an 8(f) agreement, in these circumstances, as enforceable beyond the projects under way. Had Respondent herein waited until the projects had been completed, it would be free to repudiate its agreement with the Union. In Member Penello's view, the remedy ordered by the majority would interfere with Respondent's privileges under Sec. 8(f) of the Act.

236 N.L.R.B. No. 7 at 3–4 n.5. The Company, in arguing before us that the Board exceeded its remedial authority, makes essentially the same argument as did Member Penello. Relying on the principle of *Dee Cee Floor Covering*, that a § 8(f) agreement does not create a presumption of majority status even where a majority of the bargaining unit supported the union on past projects, it contends that where an employer hires on a project-by-project basis, majority status can only be shown at projects under way at the time of the unfair labor practices. The Company argues that the Union-AGC contract was enforceable only on those projects under way in February of 1977 because, had the Company waited until those projects were completed and the employees were laid off in the normal course of business, it would have been free to repudiate the contract and offer new terms and conditions of employment. Citing record evidence that the discriminatees would have refused to work for the Company without Union benefits, it argues that the Union cannot show that it would have obtained majority status under the new conditions of employment, and, thus, the contract would be unenforceable.

---

**3.** The bargaining order issued by the Board does not present the same problems as do its contract restoration and reinstatement orders. It is settled law that the propriety of a bargaining order does not normally depend upon the existence of majority status throughout the period between the time of the unfair labor practices and the time for enforcement of the Board's order. On the contrary, the relevant date for determining the extent of the Company's duty to bargain and, thus, the propriety of a bargaining order is the time of the unfair labor practices. *Franks Brothers Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). The Board therefore properly ordered bargaining.

In my view, the question raised by Member Penello and the Company is very troubling. The majority opinion disposes of the problem by means of a broad holding that once majority status is attained in a unit covered by a § 8(f) prehire contract, the contract is to be treated like any other collective bargaining agreement and that a rebuttable presumption of continuing majority status arises "despite both the potential change in the unit's employee composition and its eventual relocation to other, future projects." Maj. at 312.[4] The majority opinion makes a plausible argument for the proposition that a presumption of continuing majority support attaches to a

§ 8(f) contract when backed by the support of a majority of the employees in a unit, and effectively points out some of the troublesome aspects of the principle that majority status must be reestablished on each new jobsite. Especially persuasive is its discussion of the conflict between the § 9(a) concept that an employer's obligations are determined with respect to a bargaining unit and the concept that § 8(f) contracts mature only on a project-by-project basis. However, the majority's analysis depends on its statement that *Dee Cee Floor Covering* is no longer good law and upon a broad reading of the language in *Higdon* quoted above.[5] But it is important to note that the

4. Contrary to the suggestion of the majority, the Company did not argue that at the expiration of the contract it could have cancelled the carpenters' benefits, fired all of its employees and therefore refused to bargain. In fact, the Company's primary argument was that had it waited until *the end of the projects* in progress in February of 1977, that is, until its employees were laid off in the normal course of business, it would have been free to repudiate the § 8(f) contract and offer new terms and conditions of employment. The record shows that the jobs under way in February of 1977 were soon to be completed, and no evidence was presented that any new projects were contemplated. Thus, it would appear that at the end of the jobs in progress, the Company would have been in the same position as was the employer in *Dee Cee Floor Covering*, in that the Company's work force would have been reduced to zero. The Company's argument, as I understand it, was that it would then have been free to offer its own terms of employment, which would not have included union benefits and that, therefore, the union would be unable to show its majority status since the union workers had already refused to work without the benefits.

It is important to note that the actions the Company contends it would have taken do not necessarily involve anti-union animus. The carpenters were hired on a project-by-project basis and were routinely laid off when no work was available. It is clear that the Act does not prohibit employment decisions based on economic realities, *see, e. g., NLRB v. Computed Time Corp.*, 587 F.2d 790 (5th Cir. 1979); *Independent Gravel Co. v. NLRB*, 566 F.2d 1091 (8th Cir. 1977); *NLRB v. Bogart Sportswear Mfg. Co.*, 485 F.2d 1203 (5th Cir. 1973); *NLRB v. AAA Electric, Inc.*, 472 F.2d 444 (6th Cir. 1973), and this Circuit has held that anti-union animus should not lightly be inferred, *see Syncro Corp. v. NLRB*, 597 F.2d 922, 924 (5th Cir. 1979); *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1259–60 (5th Cir. 1978). Under these principles, the Company would presumably be free to offer any terms of employment it de-

sired, as long as it did not discriminate against union supporters. It is crucial to note that under the Company's theory, the Company's past history of employee carryover or transfer from completed to new jobs would be irrelevant because there would have been no projects onto which the employees could have been carried over or transferred. Similarly, that the Company followed a practice of rehiring employees for new projects would be irrelevant, because the conditions under which the employers had formerly been rehired would have changed to such an extent that union workers would be highly unlikely to accept employment.

In addition to its argument keyed to the layoff of its carpenters at the end of the projects, the Company made the much weaker argument that at the *expiration date of the contract* its contractual and bargaining obligations would have ended, but the Company never asserted that it had a right to fire its employees. I agree that as long as the current projects were in progress, the contract would have been enforceable beyond its expiration date by virtue of majority support for the union in the bargaining unit. In my opinion, the perplexing issue is whether the *end of the projects* in progress would have freed the Company to ignore the contract and offer new but non-discriminatory terms of employment. It is this argument which the Board's opinion did not resolve and which the majority answers by holding that *Dee Cee Floor Covering* is a dead letter.

5. Because the facts in *Higdon* did not present an issue with respect to the propriety of a presumption of *continuing* majority status *on new projects*, a more narrow reading of the *Higdon* language is possible. In my view, one could plausibly read *Higdon* as establishing the enforceability of a § 8(f) contract which enjoys majority support without construing it to mean that the contract would remain enforceable in the face of new projects undertaken by an employer.

Board did not explicitly repudiate *Dee Cee Floor Covering* in its opinion in this case. The fact is that the Board never discussed *Dee Cee Floor Covering* in its opinion; indeed, the opinion does not deal in any way with the propriety of a presumption of continuing majority support. In my view, it is far from clear that the Board has actually repudiated the principle set out in *Dee Cee Floor Covering*.[6] In addition, I am concerned that the majority opinion largely ignores the legislative history of § 8(f), which may lend considerable support to the proposition that a presumption of continuing majority status with respect to future projects may, at least in some situations, be inappropriate.[7] In light of these considerations, I am uncomfortable with the majority's broad holding. The most fundamental problem with the majority's approach in this case, however, is that the majority supplies a rationale for the Board's remedial order which the Board itself failed to provide.

Congress has entrusted to the Board the task of " 'applying the general provisions of the Act to the complexities of industrial life,' " *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (citations omitted), quoting *NLRB v.*

---

**6.** The decisions of the Board upon which the majority relies for the proposition that the Board has repudiated the rationale of *Dee Cee Floor Covering, G. M. Masonry Co.,* 245 N.L.R.B. No. 54 (1979), and *V. M. Construction Co.,* 241 N.L.R.B. No. 84 (1979), provide little support for that inference. In my view, the Board did not reject the reasoning of *Dee Cee Floor Covering* in either case. *V. M. Construction,* like this case, involved the repudiation of a § 8(f) agreement at a time when a majority of the employees in the unit supported the union. As in this case, the Board held that under its prior decisions and that of the Supreme Court in *Higdon,* the employer was not privileged to repudiate the contract under those circumstances. The Board ordered compliance with the contract and bargaining which extended to projects not yet begun at the time of the unfair labor practices but, as in this case, the employer had a past history of employee transfer from project to project and carryover from completed to new projects. Thus, in my view *V. M. Construction* is essentially identical to this case with respect to the light it casts on the Board's position on the continuing validity of *Dee Cee Floor Covering.*

In *G. M. Masonry,* the Board, in one sentence, adopted the findings and conclusions of the ALJ, who had held that a contract which applied only to a single project was unenforceable since majority support for the union was not attained on the project and who had relied heavily on *Dee Cee Floor Covering.* In my view, the single footnote accompanying the Board's adoption of the ALJ's opinion which, in its entirety, states that "[i]n adopting the Administrative Law Judge's Decision, we disavow any inference which may appear therein suggesting that the rationale of [*Dee Cee Floor Covering*] is applicable to 9(a) bargaining relationships," 245 N.L.R.B. No. 54 at 1 n.1, is simply too cryptic and ambiguous a statement upon which to rely for the proposition that *Dee Cee Floor Covering* has "met its well-deserved demise," at 309. In fact, *G. M. Masonry* suffers from the same basic defect as does the

Board's opinion in this case, *see infra,* in that the Board's rationale for decision is nowhere explicated in the opinion.

**7.** The legislative history of § 8(f) documents the fact that it was enacted in response to the special characteristics and needs of the building and construction industry. The House and Senate Committee Reports on § 8(f) reveal Congress' awareness of the transitory nature of employment in the industry:

> The occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise. An individual employee typically works for many employers and for none of them continuously. Jobs are frequently of short duration, depending upon various stages of construction.
>
> . . . .
>
> In the building and construction industry it is customary for employers to enter into collective-bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects are of relatively short duration, such labor agreements sometimes apply to jobs which have not been started.

H.R.Rep.No.741, 86th Cong., 1st Sess. 19 (1959); 1 Leg.Hist. 777. *See also* S.Rep.No. 187, 86th Cong., 1st Sess. 28 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2441–2442; 1 Leg.Hist. 424. The Senate Report also noted that "[r]epresentation elections in a large segment of the industry are not feasible to demonstrate . . . majority status due to the short periods of actual employment by specific employers." S.Rep.No.187, 86th Cong., 1st Sess. 55 (1959), U.S.Code Cong. & Admin.News 1959, p. 2373; 1 Leg.Hist. 451–52.

After a careful reading of the cases, I am convinced that the idea that a § 8(f) contract matures only on a project-by-project basis arose in response to the concerns expressed in the legislative history of § 8(f) with respect to the tremendous rate of employee turnover and

*Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). "Its special competence in this field is the justification for the deference accorded its determination[s]." *NLRB v. Weingarten*, 420 U.S. at 266, 95 S.Ct. at 968. It is clear, however, that "[w]hen the Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 443, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965). When the Board has failed adequately to articulate the reasons for its decision, the proper course for a reviewing court is to order a remand so that the Board may explicate its rationale. *Id. See also NLRB v. Weingarten*, 420 U.S. at 268–69, 95 S.Ct. at 969 (Burger, C. J., dissenting); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *Pacific Southwest Airlines v. NLRB*, 587 F.2d 1032, 1039 (9th Cir. 1978). A remand is particularly appropriate when the Board's order appears to conflict with its past decisions and no satisfactory explanation is provided. *See, e. g., NLRB v. Weingarten*, 420 U.S. at 268–69, 95 S.Ct. at 969 (Burger, C. J., dissenting);

*Memorial Hospital of Roxborough v. NLRB*, 545 F.2d 351, 357 (3rd Cir. 1976); *NLRB v. International Union of Operating Engineers*, 460 F.2d 589, 604–05 (5th Cir. 1972). While the Board is certainly authorized to change its mind and "modify its construction of the Act in light of its cumulative experience," *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 508, 98 S.Ct. 2463, 2477, 57 L.Ed.2d 370 (1978), "when it does it must at least carefully explain its reasons, justify the change and follow controlling law." *Seafarers v. NLRB*, 101 L.R.R.M. 2628, 2631 (D.C.Cir.1979). As the Supreme Court made clear in *NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 443–44, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951, it is highly improper for "reviewing courts to substitute counsel's rationale or their discretion for that of the Board."

In my view, there are several possible explanations for the Board's remedial order in this case.[8] But, after the expenditure of tremendous time and effort by the members of this court, the bottom line is that we do not know the reason why the Board acted as it did; the Board has abdicated its role of leadership and has left us with "the burden of justifying [its decision] for reasons which we arrive at by inference and

---

potential for fluctuation in majority support on rapidly changing construction projects. In addition, it is my view that the notion evolved from a recognition that a § 8(f) contract, even in a situation in which a majority of the employees in the bargaining unit support the union, is still a *prehire* contract with respect to employees who will be hired on a future date. Thus, I disagree with the majority's statement that the legislative history of § 8(f) contains "no indication of an intention to exempt the construction industry from the law concerning bargaining relations bottomed on section 9 of the Act." At 305. Indeed, the majority's approach ignores the fact that one of the crucial differences between the construction industry and other American industries which are characterized by rapid turnover of employees and jobs of short duration is that, for the construction industry, unlike other industries, Congress took the step of enacting a special provision to deal with the labor relations problems posed by the characteristics of that industry.

8. The Board's order is subject to at least three possible interpretations. First, the Board may have intended to treat a § 8(f) contract for which majority support in a bargaining unit has been attained as, in every sense, a § 9(a) contract. This interpretation would, of course, coincide with that of the majority opinion.

Second, the Board may have intended to retreat from the principle of *Dee Cee Floor Covering* under circumstances in which a company has a prior history of substantial carryover, transfer, or rehire from project to project. If this interpretation of the Board's opinion is accurate, the Board's remedial order might well be consonant with the concerns expressed in the legislative history of § 8(f) and would have the advantage of leaving room for the Board to apply or refuse to apply the presumption on a more flexible, case-by-case basis. Third, the Board might have felt that a Company which had repudiated its bargaining and contract obligations, thus committing unfair labor practices, could not properly claim that, had it waited until the proper time, it could have followed another, legal course of action. The Board could have reasoned that the Company's argument was too speculative or unlikely in the face of the action the Company actually took.

Each possible interpretation of the Board's remedial order would require the application of a different type of analysis by this court, because each interpretation raises issues which the others do not. While we can speculate with respect to what the Board intended, in my view nothing in the Board's opinion allows us to say what the Board meant with any reasonable degree of certainty. That, above all else, is the primary flaw in the Board's remedial order.

surmise." *NLRB v. Weingarten*, 420 U.S. at 269, 95 S.Ct. at 976 (Burger, C. J., dissenting).[9]

In my opinion, the majority has filled the gap left by the Board with an explanation of the Board's actions which may or may not accurately reflect the Board's intent, and with a legal rationale which may or may not accurately reflect the intent of Congress and the past decisions of the Board and the courts. While the majority opinion represents a valiant effort to bring order to an extremely confusing field in which the Board has consistently offered little guidance, I cannot join it because, in the final analysis, it substitutes this court's own rationale for that of the Board. I would remand the contract compliance and reinstatement portions of the Board's remedial order, which extend beyond the jobs in progress at the time of the unfair labor practices, to the Board and order that it explicate the rationale for its decision in light of its own precedent and that of the courts.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK and WILLIAMS, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

**9.** Counsel for the Board, obviously hard-pressed to explain and defend the Board's position in view of the Board's own reluctance to do that, adopted the novel and, indeed, ingenious approach of suggesting that the Board properly applied a presumption of continuing majority support, and that *Dee Cee Floor Covering* is distinguishable from the facts of this case on the basis that, in contrast to the situation in *Dee Cee Floor Covering* where there was no showing that the union would have majority status on the next project, this case involves a situation in which employees were normally carried over to new projects. Brief of Petitioner at 21, *see also* Reply Brief of Petitioner at 2. The amazing thing about Counsel's argument is that it is an almost identical reproduction of the distinction made by Member Murphy in footnote five of the Board's opinion, in which Member Murphy dissented from a portion of the Board's remedial order. The distinction made by Member Murphy and urged now by Counsel for the Board may or may not be valid under the circumstances presented by this case. But Counsel's action in requesting us to adopt the very distinction which the Board itself declined to adopt is significant in that it underscores the wisdom of the Supreme Court's command that a reviewing court " 'may not accept appellate counsel's *post hoc* rationalizations for agency action,' " *NLRB v. Metropolitan Life*, 380 U.S. at 444, 85 S.Ct. at 1064, quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962), in lieu of an adequate articulation by the Board of the basis of its order.